**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY WILLIAMS, SR. o/b/o** | ) | |
| **A.W.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:14CV1057NCC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin (Defendant) denying the application for Child's Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401, 1381 et. seq., filed by Anthony Williams, Sr., (Mr. Williams or Plaintiff) on behalf of his son, A.W. Plaintiff filed a brief in Support of the Complaint. (Doc. 12). Defendant filed a Response. (Doc. 17). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 9).

### I.
### PROCEDURAL HISTORY

A.W.'s application for Child's SSI was filed on June 28, 2011, alleging a disability onset date of January 1, 2011. (Tr. 124-30). The claim was denied and

Plaintiff filed a request for a hearing before an Administrative Law Judge (ALJ). (Tr. 75-84). A hearing was held before an ALJ on December 20, 2012. (Tr. 44-74). By decision, dated February 7, 2013, the ALJ found that A.W. was not disabled as defined by the Act. (Tr. 13-32). On April 9, 2014, the Appeals Council denied the request for review. (Tr. 1-6.) As such, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## LEGAL STANDARD FOR CHILD DISABILITY CASES

20 C.F.R. § 416.906 (2000) provides the definition for disability in children. That provision states:

> If you are under age 18, we will consider you disabled if you have a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

In determining disability, the ALJ must utilize a sequential evaluation process set forth in 20 C.F.R. § 416.924. The ALJ first determines whether the claimant is performing "substantial gainful activity." 20 C.F.R. § 416.924(a), (b). If so, the claimant is not disabled. 20 C.F.R. § 416.924(a), (b). If not, the ALJ considers the claimant's physical or mental impairment(s) to determine whether he or she has a medically determinable impairment(s) that is severe. 20 C.F.R. § 416.924(c). For an individual who has not attained the age of eighteen, if the impairment(s) is not medically determinable or is a slight abnormality that causes

minimal limitations, the ALJ will find that the claimant does not have a severe impairment and is not disabled. 20 C.F.R. § 416.924(c). If the impairment(s) is severe, the analysis proceeds to the third step of the sequential analysis. 20 C.F.R. § 416.924(s). At the third step, it must be determined whether the claimant has an impairment which "meet[s], medically equal[s], or functionally equal[s] the listings." 20 C.F.R. § 416.924(d).

Further, when determining functional limitations, 20 C.F.R. § 416.926a(a) provides that where a severe impairment or combination of impairments does not meet or medically equal any listing, the limitations will "functionally equal the listings" when the impairment(s) "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." A limitation is "marked" when it "interferes seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). A limitation is "extreme" when it "interferes very seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3).

The ALJ considers how a claimant functions in activities in the following six domains: "(i) Acquiring and Using Information; (ii) Attending and Completing Tasks; (iii) Interacting and Relating to Others; (iv) Moving About and Manipulating Objects; (v) Caring for Yourself; and (vi) Health and Physical Well-Being." 20 C.F.R. § 416.926a(b)(1). Also, in assessing whether a claimant has

"marked" or "extreme" limitations, an ALJ must consider the functional limitations from all medically determinable impairments, including any impairments that are not severe. 20 C.F.R. § 416.926a(a). Further, the ALJ must consider the interactive and cumulative effects of the claimant's impairment or multiple impairments in any affected domain. 20 C.F.R. § 416.926a(c).

20 C.F.R. § 416.926a(e)(2) explains:

(i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3) further explains:

(i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> The concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court

must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. <u>See</u> <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001) (citing <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. <u>See</u> <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). <u>See also</u> <u>Onstead v. Sullivan</u>, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. <u>See</u> <u>Krogmeier</u>, 294 F.3d at 1022. <u>See also</u> <u>Eichelberger</u>, 390 F.3d at 589; <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000) (quoting <u>Terrell v. Apfel</u>, 147 F.3d 659, 661 (8th Cir. 1998)); <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's

complaints.  See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence.  Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).  The ALJ, however, "need not explicitly discuss each Polaski factor."  Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).  See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)).  The ALJ need only acknowledge and consider those factors.  See id.  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

### III.
### DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled.  Onstead, 962 F.2d at 804.  Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position.  Krogmeier, 294 F.3d at 1022.

The application for SSI, filed on behalf of A.W., alleged that he had severe impairments of attention deficit hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), and a learning disorder. (Tr. 116). At the hearing, A.W.'s father, Mr. Williams, testified that A.W. was currently learning to subtract; that he was supposed to be in the third grade, but was behind after being held back in the first grade; A.W. had been on medication for about one year; A.W. did not listen and "constantly" got in trouble and received suspensions from school; A.W. frequently got into fights with his sister, both at school and at home; and A.W. did not play video games for very long because he would become frustrated. (Tr. 56-58, 65, 70-71).

The ALJ found that A.W., who was born in May 2004, was a school aged child on the date the application was filed, June 28, 2011; he had not engaged in substantial gainful activity since the application date; A.W. had the severe impairments of ADHD, ODD and a learning disorder; A.W. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment; and A.W. did not have an impairment or combination of impairments that functionally equaled the severity of the listings.

Upon making these determinations, the ALJ considered the six functional equivalence domains specified in the Regulations as set forth above. Based on the evidence of record, including testimony, medical and school records, evaluations,

and test results, the ALJ found that A.W. had "marked" limitations in the domain of Acquiring and Using Information; A.W. had less than a "marked" limitation in the domains of Interacting and Relating with Others and Caring for Yourself; and A.W. had no limitation in the domains of Moving About and Manipulating Objects and Health and Physical Well-Being. As such, the ALJ concluded that A.W. did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains of functioning or "extreme" limitations in one domain of functioning and that, therefore, A.W. was not disabled within the meaning of the Act.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because: The ALJ failed to properly consider the six domains of functioning as A.W. had a "significant impairment in his ability to attend and complete tasks as well as acquire and use information"; the ALJ erred in finding that A.W. did not functionally equal a listing; and the ALJ did not give proper weight to the opinion of Anita Stiffelman, M.D., who treated and examined A.W. on a number of occasions. For the following reasons, the court finds that the ALJ's determination that Plaintiff is not disabled is based on substantial evidence and is consistent with the Regulations and case law.

## A.    Credibility:

The court will first consider the ALJ's credibility determination, as the ALJ's

evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues. Cf. Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010). As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ. See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882.

To the extent that the ALJ did not specifically cite Polaski, other case law, and/or Regulations relevant to a consideration of A.W.'s credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See

also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). For the following reasons, the court finds that the ALJ's consideration of the credibility of allegations regarding the severity of A.W.'s conditions is based on substantial evidence and consistent with the Regulations and case law.

First, the ALJ considered the effect of A.W.'s medications on his conditions. Conditions which can be controlled by treatment are not disabling. See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010)); Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling). Additionally, the absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a claimant's complaints are credible. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical records during this time period

mention [the claimant's] having side effects from any medication."); Richmond v. Shalala, 23 F.3d 1441, 1443-44 (8th Cir. 1994).

In particular, the ALJ considered that A.W. presented to Dr. Stiffelman, on September 13, 2011, and, on this date, Dr. Stiffelman prescribed Vyvanse. (Tr. 16, 253). Subsequently, Dr. Stiffelman reported, on October 4, 2011, that A.W.'s ADHD had a *good response to medication* and that his *social issues were correcting. Medication side effects were denied.* (Tr. 16, 258). On February 13, 2012, Dr. Stiffelman reported that A.W. had increased "acting out" when he was not on his medication; that *Vyvanse helped* with A.W.'s ADHD; that he had *decreased ODD symptoms while taking medication* as well; and that A.W. *denied side effects* from his medication (Tr. 255). On March 28, 2012, A.W.'s prescription was refilled, without change. (Tr. 16, 255). When A.W. presented for care with Jahmille Simon, P.N.P, B.C., on December 29, 2012, this provider noted that A.W.'s Vyvanse, in the morning, was not working very well but he prescribed this medication nonetheless. (Tr. 269-70).

Second, the ALJ considered that, in May 2012, A.W.'s prescription was not picked up and that it was shredded. (Tr. 16, 255). Also, on August 28, 2012, Dr. Stiffelman reported that A.W. was not compliant with his medication and that A.W. frequently stayed with his uncle who forgot to give him his medication. (Tr. 16, 256). On August 28, 2012, Dr. Stiffelman noted that she had not written a

prescription since March 28, 2012, and that she restarted A.W. on Vyvanse. (Tr. 16, 256). A claimant's non-compliance with prescribed medical treatment is a factor which an ALJ may properly consider. See Eichelberger, 390 F.3d at 589 (holding that the ALJ properly considered that the A.W. cancelled several physical therapy appointments and that no physician imposed any work-related restrictions on her) (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain). See also Wildman v. Astrue, 596 F.3d 959, 968-69 (8th Cir. 2010) (it is permissible for ALJ to consider claimant's non-compliance with prescribed medical treatment). As noted by the ALJ, as a child, A.W. was not responsible for his non-compliance; rather, it is significant that the record reflects that when his caretakers properly administered his medicine, A.W.'s symptoms improved.

Third, the court notes discrepancies between the severity of A.W.'s symptoms, as alleged by Mr. Williams, and what Mr. Williams, A.W. and A.W.'s teacher reported to Dr. Stiffelman. See Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) (contradictions between a claimant's sworn testimony and what he actually told physicians weighs against the claimant's credibility). In this regard, on February 13, 2011, Mr. Williams told Dr. Stiffelman that A.W. was "doing good," but he sometimes "jump[ed] up and r[a]n[] out." (Tr. 16, 254-55). On

August 28, 2012, Dr. Stiffelman reported that A.W. said he was doing "super good" without medication, and that Mr. Williams said there had been no complaints from A.W.'s teacher. (Tr. 16, 256). Notably, when A.W. presented to Dr. Stiffelman, on October 4, 2011, Dr. Stiffelman reported that A.W.'s teacher had reported that his participation had been "good," and he had "increased obeying," and that the principal reported that he was "pretty good." (Tr. 258).

Fourth, the ALJ considered that evidence suggested A.W.'s father exaggerated A.W.'s symptoms and limitations. In particular, the ALJ noted that A.W.'s father testified that A.W. was constantly in trouble at school and had received multiple suspensions, but that the record indicated that A.W. had only one in-school suspension for classroom disruption. Additionally, there was no evidence that A.W. was in trouble "all the time" or that his father was required to come to school three times a week. To the extent A.W.'s father alleged A.W. had problems hearing and seeing, there was nothing in the record to substantiate these problems. (Tr. 22, 58, 137-45, 175-86). "[A]n ALJ may disbelieve a claimant's subjective reports of [symptoms] because of inconsistencies or other circumstances." Eichelberger, 290 F.3d at 589.

## B.    Dr. Stiffelman's Opinion:

On September 25, 2012, Dr. Stiffelman completed an Individual Functional Assessment For Ages 6 to 12, in which she opined as follows: In the domain of

Acquiring and Using Information, Dr. Stiffelman stated that she could not assess A.W., but that A.W. was slow to answer questions and that he probably had learning disabilities, in addition to attention deficit disorder (ADD). In the domain of Attending and Completing Tasks, Dr. Stiffelman opined that A.W. had extreme limitations, and noted that this opinion was based mostly on history provided by A.W.'s father. In the domain of Interacting and Relating with Others, Dr.` Stiffelman opined that A.W. had less than marked limitations. She did not assess A.W. in the domain of Moving About and Manipulating Objects and the domain of Caring for Yourself. In the domain of Health and Physical Well-Being, Dr. Stiffelman opined that A.W. had marked limitations, noting that he had "[s]ocial disadvantages"; that his "Mom [was] removed from his life"; that his father had "limited ability"; and that A.W.'s uncle, who was in the home, would forget to give A.W. his ADD medication. (Tr. 963). Plaintiff contends that the ALJ erred in failing to give controlling weight to Dr. Stiffelman's opinion that A.W. had an extreme limitation in Attending and Completing Tasks and a marked limitation in Health and Physical Well-Being. (Doc. 12 at 12). For the following reasons, the court finds Plaintiff's arguments without merit.

First, ALJ considered treatment records prepared by Dr. Stiffelman, who was A.W.'s treating pediatrician, and that these records were inconsistent with Dr. Stiffelman's conclusions regarding the severity of A.W.'s symptoms. (Tr. 16).

See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate the need to evaluate the record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data).

Notably, the record reflects that A.W. presented for care with Dr. Stiffelman on September 13, 2011. On this date, as discussed, in part, above, Dr. Stiffelman diagnosed A.W. with ADHD symptoms, a possible learning disorder, and elements of ODD, and she prescribed Vyvanse. (Tr. 253). When she saw A.W. on October 4, 2011, Dr. Stiffelman reported that A.W.'s teacher said A.W.'s *participation* had been *"good"* and he had *increased "obeying."* She noted that A.W. was *cooperative* but slow to answer questions; that, the next week, he was going to get a "new individualized education plan (IEP) at school; and that A.W.'s ADHD was *responding well to medication* and that his *social issues were correcting*. (Tr. 258). See Renstrom, 680 F.3d at 1066 (conditions which can be controlled by medication are not disabling). When A.W. presented, on November 10, 2011, Dr.

Stiffelman reported that A.W.'s father reported that he was *doing "good"*; that his father was a "vague historian"; that A.W.'s attitude was the same; and that he "jump[ed] up" and ran "a lot." (Tr. 254). On February 13, 2012, Dr. Stiffelman reported that, if A.W. forgot to take his medicine, he acted out, see Wildman, 596 F.3d at 964-65[1]; that his ADHD improved with medication; and that A.W. had *decreased ODD symptoms when taking medications* for that condition, see Renstrom, 680 F.3d at 1066. (Tr. 255). A.W. did not show up for his next appointment, on August 2, 2012. (Tr. 256).

When Dr. Stiffelman saw A.W., on August 28, 2012, she reported that A.W. had received an IEP for the new school year and that, so far, *his teacher had not reported any issues* for the past two and a half weeks. She further reported that A.W. had not been compliant with his medications; that A.W.'s father gave a vague history of the situation; that A.W.'s mother was out of the picture; and that A.W. frequently stayed with his uncle who would forget to give A.W. his medications. Dr. Stiffelman continued to prescribe Vyvanse both on this date and on October 12 and December 29, 2012. (Tr. 256-57, 266-67).

Thus, although Dr. Stiffelman opined that A.W. had a marked limitation in the domain of Health and Well Being and an extreme limitation in the domain of

---

[1] As stated above, the court stresses that A.W., as a young child was not responsible for his non-compliance; rather, the court means to stress that when A.W.'s caregivers were compliant with giving A.W. his medication, A.W.'s conditions improved.

Attending and Completing Tasks, substantial evidence supports the ALJ's conclusion that her treatment notes do not support such findings.

Second, to the extent the ALJ did not give Dr. Stiffelman's opinion controlling weight, her checkmarks on the form were conclusory opinions, and, as such, could be discounted by other objective medical evidence, as well as by Dr. Stiffelman's own treatment notes which fail to reflect the severity of her findings in the domains of Attending and Completing Tasks and Health and Well-Being. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan, 239 F.3d at 961; Social Security Ruling (SSR) 96-2p, 1996 WL 374188 (July 2, 1996).

Third, upon declining to give Dr. Stiffelman's opinion controlling weight, the ALJ also noted that Dr. Stiffelman's opinion was based "quite heavily on the subjective report of symptoms and limitations provided by [A.W.'s] father." (Tr. 23). Indeed, the ALJ was entitled to give less weight to Dr. Stiffelman's opinion to the extent it was based on subjective complaints rather than objective evidence. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007). Further, as discussed above, the ALJ's determination not to credit the testimony of A.W.'s father regarding the severity of A.W.'s symptoms is based on substantial evidence. See Eichelberger, 290 F.3d at 589.

Fourth, as discussed above in regard to Plaintiff's credibility, Dr. Stiffelman reported that A.W. did not regularly take prescribed medication, but that, when he

did take his medication, his ADHD and ODD were better. (Tr. 16, 253, 255, 258). Fifth, Dr. Stiffelman's conclusions are inconsistent with what A.W.'s teacher told her, and what Mr. Williams told her, on occasion. (Tr. 16, 254-56).

Fifth, the ALJ considered the report prepared by Allison Burner, M.A., who saw A.W., on September 9, 2011, pursuant to a referral from the State agency for a psychological consultative examination for purposes of determining A.W.'s eligibility for Social Security benefits. (Tr. 21). Ms. Burner noted that A.W., who was seven years old at the time of the examination, was brought by his uncle, and that the uncle reported that A.W.'s father was mentally retarded; that when A.W.'s father was awarded custody of A.W., two years prior, the uncle moved in to the home to help care for the children; that A.W. was not receiving special education at the time; that A.W. had never been evaluated for ADHD; and that he had an appointment the next week for an evaluation. (Tr. 233-34).

Ms. Burner observed that A.W. was *cooperative* with the interview and testing; his *affect* was *within normal limits*; he had "significant psychomotor agitation"; his speech was intelligible; and his *social language functioning* was *within normal limits*. Ms. Burner reported that the Wechsler Intelligence Scale for Children –IV (WISC-IV) established that A.W. had a full scale I.Q. of 92, which was in the average range; that A.W.'s profile suggested *average* ability in the area of Verbal Comprehension, which measures *verbal reasoning*, *auditory*

*comprehension, verbal expression, verbal concept formation, fund of knowledge, long term memory, abstract thinking, and social judgment and reasoning*. Ms. Burner further reported that A.W.'s score in the Perceptual Reasoning portion of the test she administered measured in the average range. She additionally reported that A.W. tested in the *average range* in the area of Working Memory, which measures the use of visual and verbal strategies for information storage, retrieval, and recall, and which involves, among other things, *mental control, attention, and concentration*. A.W. tested in the low average range in regard to the Processing Speed, which area evaluates visual motor coordination, discrimination, scanning, and memory and "graphomotor speed." (Tr. 235-36).

A mental status examination administered by Ms. Burner showed A.W. was oriented; he did not have perceptual disturbances; A.W.'s *mental calculations and control were adequate and age appropriate* in that he could count to 100 and do some simple addition and subtraction; his information was within normal limits for his age; and his insight and judgment were average as evidenced by his responses to comprehension questions when tested. Ms. Burner reported no deficits in adaptive functioning, and *normal social functioning*. (Tr. 236). Based on her evaluation, Ms. Burner concluded that A.W. did not meet the criteria for any psychiatric diagnosis other than ADHD; that he would benefit from treatment; that with appropriate medical intervention, A.W. should be able to obtain a "high

diploma"; that his ability to relate "socially, occupationally, and adaptively, appear[ed] to be intact"; and that A.W. had a Global Assessment of Functioning (GAF)[2] of 70. The court notes that a GAF of 70 indicates the high end of mild symptoms, and that, to the extent the ALJ gave Ms. Burner's opinion greater weight that Dr. Stiffelman's opinion, Ms. Burner's opinion was based on objective test results. Indeed, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v.

---

[2] Global assessment of functioning (GAF) is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32. See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("[A] GAF score of 65 [or 70] . . . reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships.'") (quoting Kohler v. Astrue, 546 F.3d 260, 263 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (alterations in original). See also Goff, 421 F.3d at 791, 793 (affirming where court held GAF of 58 was inconsistent with doctor's opinion that claimant suffered from extreme limitations; GAF scores of 58-60 supported ALJ's limitation to simple, routine, repetitive work).

Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). See also Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.").

Sixth, upon determining not to give controlling weight to Dr. Stiffelman's opinion, the ALJ considered the opinion of A.W.'s Special School District Resource Teacher, Maggie A. Lofton, as expressed in a September 2012 Domain Evaluation. As relevant, Ms. Lofton opined that A.W. had *less than marked limitations in the domain of Acquiring and Using Information, explaining that he read at the kindergarten level;* that *his math was at least the second grade level;* and that he had low vocabulary skills, was unable to spell words, and had difficulty retaining information.[3] (Tr. 22, 24, 191-92).

Seventh, the ALJ considered the opinion of Robert Cottone, Ph. D., who completed a Childhood Disability Evaluation Form, on September 16, 2011. After reviewing A.W.'s records, Dr. Cottone opined that Plaintiff did not have an

---

[3] The ALJ also considered that Ms. Lofton further opined that A.W. had marked a marked limitation in the Domain of Attending and Completing Tasks, explaining that an adult had to sit with A.W. in order for him to complete a task, and that he required many prompts and reminders to remain seated and to switch activities. Ms. Lofton also opined that A.W. had marked limitations in the Domain of Interacting and Relating to Others, no limitations in the Domain of Moving About and Manipulating Objects, marked limitations in the Domain of Caring for Yourself, and less than marked limitations in the Domain of Health and Physical Well Being. (Tr. 22, 192). The ALJ gave "some weight" to Ms. Lofton's opinion but noted that there "was a significant issue with [A.W.'s] compliance with his medication and it [was] likely that this reflected periods of non-compliance." (Tr. 23).

impairment or combination of impairments which met or medically equaled or functionally equaled the Listings. (Tr. 239). In particular, Dr. Cottone noted that he reviewed the medical opinion evidence, and evaluated A.W.'s physical and mental symptoms before reaching his conclusion. See 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) (State agency medical consultants are highly qualified experts in Social Security disability evaluation; therefore, ALJs must consider their findings as opinion evidence.); Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007) (moderate limitations do not prevent an individual from functioning "satisfactorily").

Eighth, Dr. Stiffelman's opinion was not entitled to controlling weight simply because she was A.W.'s treating doctor. Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013). Rather, upon determining that Dr. Stiffelman's opinion was not to be given controlling weight, the ALJ was fulfilling his role to resolve conflicts among the various medical providers of record. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002).

Finally, as discussed above, and below, the ALJ considered all of the evidence of record, including testimony, doctor's observations and examination notes, and objective testing results, upon determining the weight to be given Dr. Stiffelman's opinion, as well as other opinion evidence of record. To the extent A.W. contends that the ALJ's decision is not supported by substantial evidence

because it does not completely mirror Dr. Stiffelman's opinion, in reaching his conclusion regarding the severity of a claimant's impairments, an "ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011). In conclusion, the court finds that the ALJ gave proper weight to Dr. Stiffelman's opinion, as well as all other opinions of record, and that the ALJ's decision, in regard to opinion evidence, is based on substantial evidence and consistent with the Regulations and case law.

**B.     ALJ's Consideration of the Functional Domains and Whether A.W.'s Conditions Functionally Equaled a Listing:**

As discussed above, in regard to the applicable legal standard, to find a child disabled within the meaning of the Act, an ALJ must determine whether the child has a medically determinable physical or mental impairment which results in marked and severe functional limitations. Specifically, to qualify for benefits, the child's impairments must result in "marked" limitations in two domains of the five functioning domains or an "extreme" limitation in one of the domains. 20 C.F.R. §§ 416.906, 416.926a. As further discussed above, the ALJ found that A.W. had less than a marked limitation in the domain of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Yourself, and no limitations in the domain of Moving About. A.W. contends the ALJ should have found "marked" or "extreme" limitations in the domains of

Acquiring and Using Information and Attending and Completing Tasks  (Doc. 12 at 7-11).

    *1.    Domain of Acquiring and Using Information:*

As relevant, 20 C.F.R. 416.926a provides, in regard to the domain of Acquiring and Using Information:

> (g) Acquiring and using information.  In this domain, we consider how well you acquire or learn information, and how well you use the information you have learned.

> (1) General.

> (i) Learning and thinking begin at birth.  You learn as you explore the world through sight, sound, taste, touch, and smell.  As you play, you acquire concepts and learn that people, things, and activities have names.  This lets you understand symbols, which prepares you to use language for learning.  Using the concepts and symbols you have acquired through play and learning experiences, you should be able to learn to read, write, do arithmetic, and understand and use new information.
> (ii) Thinking is the application or use of information you have learned. It involves being able to perceive relationships, reason, and make logical choices.  People think in different ways.  When you think in pictures, you may solve a problem by watching and imitating what another person does.  When you think in words, you may solve a problem by using language to talk your way through it.  You must also be able to use language to think about the world and to understand others and express yourself; e.g., to follow directions, ask for information, or explain something.

> (2) Age group descriptors—

> . . . .

> (iv) School-age children (age 6 to attainment of age 12).  When you are old enough to go to elementary and middle school, you should be

able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

. . . .

(3) Examples of limited functioning in acquiring and using information. The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one. As in any case, your limitations must result from your medically determinable impairment(s). However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.

(i) You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.
(ii) You cannot rhyme words or the sounds in words.
(iii) You have difficulty recalling important things you learned in school yesterday.
(iv) You have difficulty solving mathematics questions or computing arithmetic answers.
(v) You talk only in short, simple sentences and have difficulty explaining what you mean.

When determining that A.W. had "less than marked" limitations in the

domain of "Acquiring and Using Information," the ALJ considered that Dr. Stiffelman offered no opinion regarding the limitations in this domain upon her completing an Individual Functional Assessment – Ages 6 to 12 (Tr. 24, 262), and that A.W.'s teacher, Maggie Lofton, opined that A.W. has "less than marked" limitations in this domain (Tr. 24, 191). Notably, as considered by the ALJ, Ms. Lofton opined that A.W.'s math skills were at the appropriate level. (Tr. 191). As discussed above in regard to the ALJ's credibility analysis, the ALJ also noted that Ms. Burner reported, pursuant to her September 2011 consultive examination of A.W., that A.W. demonstrated an age-appropriate ability to maintain mental calculations and control information. Specifically Ms. Burner noted A.W. could count to 100, perform simple addition and subtraction, and that he knew his ABCs and days of the week. (Tr. 21, 236). The ALJ also considered that on the WISC-IV administered by Ms. Burner, A.W. tested in the average range with a full-scale IQ of 92. (Tr. 20-21, 234).

As relevant to the domain of Acquiring and Using Information, the ALJ also considered a December 13, 2011 Psychological-Educational Assessment completed by teachers and psychologists at A.W.'s school. (Tr. 20, 195-210). It was noted, in this Assessment, that, on the Wechsler Nonverbal Scale of Ability (WNV), which is designed "to measure general ability with test activities that minimize or eliminate verbal requirements," A.W. scored in the *average range*.

(Tr. 198).  This test score indicated that A.W. scored higher than approximately 32 of 100 individuals his age (Tr. 201), and that his overall use of language was appropriate, including his variety of sentence structures, his use of detail and elaboration, and his vocabulary.  (Tr. 204-205).  It was noted, in regard to an informal language assessment, that when A.W. did not understand a query, he requested repetition, and when the examiner did not understand A.W.'s "message, [he] was able to repair/revise it.  He provided detail and elaboration when counting personal experiences."  (Tr. 204).

Additionally, as noted by the ALJ, although A.W. was placed on an IEP, he spent eighty percent of his time in a regular classroom.  (Tr. 24, 73-74, 184, 220).  According to February and November 2012 IEP records, A.W. functioned "in the average range of cognitive ability."  (Tr. 176, 214).  A.W.'s February 2012 IEP also reflects that A.W.'s ability to apply academic skills was in the low-average range; his written expression was average; and his reading comprehension, math calculation skills, math reasoning, and written language were low-average.  (Tr. 176).

Significantly, A.W.'s second grade report card reflected that A.W. was making basic progress in regard to using effective organizational strategies, completing assigned tasks, completing homework, using details from text in written responses, listening attentively and critically for information, using

standard English in spoken language, reading, writing, and comparing numbers, and "developing fluency with basic addition facts to 20." As such, the court finds that substantial evidence supports the ALJ's determination that A.W. had "less than marked" limitations in the functional domain of "Acquiring and Using Information."

2. *Domain of Attending and Completing Tasks:*

As relevant, 20 C.F.R. 416.926a provides:

(h) Attending and completing tasks. In this domain, we consider how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them.

(1) General.

(i) Attention involves regulating your levels of alertness and initiating and maintaining concentration. It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed. It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.

(ii) Adequate attention is needed to maintain physical and mental effort and concentration on an activity or task. Adequate attention permits you to think and reflect before starting or deciding to stop an activity. In other words, you are able to look ahead and predict the possible outcomes of your actions before you act. Focusing your attention allows you to attempt tasks at an appropriate pace. It also helps you determine the time needed to finish a task within an appropriate timeframe.

. . . .

(iv) School-age children (age 6 to attainment of age 12). When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

. . . .

(3) Examples of limited functioning in attending and completing tasks. The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one. As in any case, your limitations must result from your medically determinable impairment(s). However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.

(i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.
(ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.
(iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.
(iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.

(v) You require extra supervision to keep you engaged in an activity.

When determining that A.W. had "less than marked" limitations in the domain of "Attending and Completing Tasks," the ALJ considered that, although the evidence demonstrated that A.W. had some limitations within this domain, the evidence also demonstrated that these limitations were less than marked. (Tr. 24-25). Thus, the ALJ concluded that A.W.'s limitations did not seriously interfere with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). Upon reaching this conclusion, the ALJ rejected Dr. Stiffelman's opinion that A.W. had extreme limitations in this domain (Tr. 262), and considered that Ms. Burner reported that A.W. could count to 100, do simple addition and subtraction, and that he scored in the average range on the WISC-IV IQ test (Tr 25, 233-36). The ALJ also considered that A.W.'s December 2011 Psychological-Educational Assessment noted that A.W. was "compliant, focused, [] calm," and "*always followed directions given to him*." (Tr. 20, 197) (emphasis added). The ALJ also considered that, during a November 2011 classroom observation, it was noted that, despite some off-task behaviors, including getting out of his seat and walking around, A.W. was *able to refocus* after the teacher "initiated verbal contact with [him]." (Tr. 20, 200-201). Records reflect that during this classroom observation, "there were about 5 other students that were also having difficulty in class," and that, therefore, A.W.'s behavior was not

atypical form that of other peers in the class." It was also noted that during another November 2011 classroom observation, A.W. "needed redirection just as others in the class did. Others in the class were redirected 13 times by the classroom teacher and [A.W.] was redirected 2 times." (Tr. 201). See Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 723024 (8th Cir. 2005) (claimant did not have "marked" limitations where she "had no other difficulties that were any different from those common among children").

While a December 2011 Speech and Language Evaluation showed that A.W. demonstrated some difficulty with task focus, concentration, and following directions, the examiner described A.W.'s behavior as only a "mild" difficulty and noted that he responded well to redirection; he was "responsive to the examiner and the tasks presented." "Rapport was easily established and maintained throughout the testing situation." (Tr. 20, 202). Additionally, Mr. Williams testified that A.W. played video games, although he did not do so for very long; that he watched complete programs on television; and that he played basketball. (Tr. 68-69). Thus, the court finds substantial evidence supports the ALJ's determination that A.W. had "less than marked" limitations in the domain of Attending and Completing Tasks. In conclusion, the court finds that the ALJ's determination that A.W. did not have marked limitations in two domains or a severe limitation in one domain and that he was, therefore, not entitled to benefits,

is based on substantial evidence and consistent with the Regulations and case law.

## IV.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports Commissioner's decision that A.W. is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff Anthony Williams, Sr., o/b/o A.W., in his Complaint and Brief in Support of Complaint (Docs. 1, 12) is **DENIED**;

**IT IS ORDERED** that a separate judgment be entered incorporating this Memorandum and Order.

Dated this 29th day of September 2015.

/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE